# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KENNETH STEAGALL,                                      Case No. 1:12-cv-876

        Plaintiff,                              Barrett, J.
                                                       Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


## REPORT AND RECOMMENDATION

Plaintiff Kenneth Steagall filed this Social Security appeal in order to challenge the Defendant's determination that he is not disabled.  *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents four claims of error, all of which the Defendant disputes.  As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED because it is supported by substantial evidence in the administrative record.

### I.  Summary of Administrative Record

This proceeding involves Plaintiff's appeal of the most recent denial of his application for Disability Insurance Benefits ("DIB").

Plaintiff first applied for DIB in April 2004, alleging disability due to back and neck pain resulting from a November 2002 car accident, with a disability onset date, as amended, of July 29, 2003.  After his application was denied initially and upon reconsideration, Plaintiff requested a hearing *de novo* before an Administrative Law Judge ("ALJ").  After two evidentiary hearings, ALJ Deborah Smith denied Plaintiff's application in a written decision dated April 26, 2007, concluding that Plaintiff was not

disabled. (Tr. 12-19). The Appeals Council rejected Plaintiff's appeal of that decision, and Plaintiff sought further appeal in this Court. *Steagall v. Com'r of Soc. Sec.*, Case No. 1:07-cv-961.

United States Magistrate Judge Timothy S. Hogan[1] recommended affirming the Commissioner's decision, but the presiding district judge disagreed and remanded to the Commissioner for further review. The Court held that the ALJ had committed reversible error, particularly concerning her analysis of the opinions of Drs. Wunder and Murphy. (*See* Tr. 617-626, Docs. 14 and 16 in Case No. 1:07-cv-961).

Following remand, ALJ Smith held another evidentiary hearing on February 22, 2011, at which Plaintiff, a vocational expert, and a medical expert all testified. (Tr. 547-584, 914-986). On April 8, 2011, ALJ Smith issued a second written decision, again concluding that Plaintiff was not disabled prior to December 31, 2009, his date last insured. (Tr. 592-610).

Plaintiff has not engaged in substantial gainful activity during the relevant disability period. The ALJ determined that Plaintiff suffers from the following severe impairments: "degenerative disc disease, and shoulder impingement with underlying acromioclavicular joint arthrosis." (Tr. 594). The ALJ also noted non-severe impairments including diabetes, knee pain, obesity, and dysthymic disorder. (Tr. 594-597). She rejected Plaintiff's allegation that he is impaired by carpal tunnel syndrome. (*Id.*). Considering Plaintiff's severe and established non-severe impairments as a whole, the ALJ determined that Plaintiff did not have any impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 597). The ALJ found that as of his date last insured,

---

[1] Although U.S. District Judge Michael R. Barrett remains the presiding district judge, this case was assigned to the undersigned magistrate judge in light of Judge Hogan's retirement from the bench.

Plaintiff retained the residual functional capacity ("RFC") to perform a range of light work, "except he can sit, stand, and/or walk for 6 hours each, with the ability to alternate sitting and standing for 5 minutes every hour."   In addition, the ALJ found Plaintiff capable of lifting and/or carrying "10 pounds with the right side and up to 20 pounds with the left side."  (Tr. 598).

Plaintiff was "closely approaching advanced age" as of his alleged disability onset date, and was 55 years old, or "of advanced age," as of his date last insured.  (Tr. 608).  He has at least a high school education and past relevant work as an electrician, which he performed at the "heavy" exertional level for approximately thirty years.  Based on that work, Plaintiff acquired transferable skills in electrical maintenance.  (Tr. 608-609).   The ALJ determined that, prior to his date last insured, Plaintiff could have performed jobs that exist in significant numbers in the national economy, including dispatcher, expediter/material lister, and electrical equipment assembler. (Tr. 609).  Accordingly, the ALJ determined that Plaintiff was not under disability prior to December 31, 2009, as defined in the Social Security Regulations.  (*Id*.).

The Appeals Council denied Plaintiff's request for review of the ALJ's 2011 decision.  Therefore, that decision stands as the Defendant's final determination.  On appeal to this Court, Plaintiff argues that the ALJ repeated the errors for which this Court previously remanded: (1) by rejecting the opinions of Drs. Murphy and Wunder; (2) by relying on the testimony of non-treating physician consultants; (3) by relying on vocational expert testimony that did not accurately reflect Plaintiff's limitations; and (4) by improperly assessing Plaintiff's credibility.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

4

In considering an application for either DIB or SSI benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he or she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he or she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him or her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

**B.  Specific Errors**

**1.  The Opinions of Drs. Murphy and Wunder versus Dr. Hill**

**a. The Basis For Remand of the 2007 ALJ Decision**

As stated, the primary reason for this Court's remand of the ALJ's 2007 decision was her failure to adequately explain why she gave more weight to the opinion of consulting physician Dr. Hill than to the opinions of treating Drs. Murphy and Wunder. Dr. Murphy was Plaintiff's primary care physician for ten months in 2006-2007.   Dr.

Wunder was a rehabilitative specialist to whom Plaintiff was initially referred by Dr. Stambough, a treating neurosurgeon who performed a spinal fusion on Plaintiff in March of 2004.

Plaintiff asserts that both Drs. Wunder and Murphy were "treating physicians" whose opinions should have been given "controlling weight."  Plaintiff argues that the ALJ's failure to adopt their opinions warrants reversal by this Court for a second time.

The relevant regulation concerning treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R.  §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).   The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)).  Thus, the treating physician rule requires "the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians."   *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).  Additional regulations require the Commissioner to generally give greater weight to examining sources than to non-examining sources, and to consider the same factors for review of any medical source opinion. *See* 20 C.F.R. §404.1527(c).

Despite the presumptive weight given to the opinions of the treating physician, if those opinions are not "well-supported" or are inconsistent with other substantial evidence, then the opinions need not be given controlling weight. Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996). In such cases, the ALJ should review additional factors to determine how much weight should be afforded to the opinion. These factors include, but are not limited to: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406; *see also* 20 C.F.R. §404.1527(c)(2). "[A] finding that a treating source medical opinion...is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley*, 581 F.3d at 408 (quoting Soc. Sec. Rul. 96-2p).

In her first opinion in 2007, the ALJ rejected Dr. Wunder's opinions in just two sentences, finding Dr. Wunder's assessment to be inconsistent "with the record as a whole" and an inappropriate determination of disability that is "reserved to the Commissioner." (Tr. 17). Similarly, the ALJ succinctly faulted Dr. Murphy for failing to "cite detailed limitations regarding specific individual functions." (Tr. 17). In 2011, the same ALJ explained her reasoning in an opinion that is more than double the length of her prior opinion. In fact, just the portion of the most recent decision devoted to analysis of Drs. Murphy and Wunder's respective opinions exceeds the entire length of the ALJ's 2007 opinion. Thus, to the extent that the ALJ has repeated her prior errors, she has done so in surpassing detail.

The magistrate judge assigned to Plaintiff's first judicial appeal stated that he did not "fully understand" the ALJ's criticism of the two treating physician opinions, to the

extent that those opinions reflected the period of 2005-2007, and therefore were not necessarily inconsistent with earlier 2004 opinions on which the ALJ relied. Magistrate Judge Hogan pointed out that the opinions could be reconciled if Plaintiff's condition had worsened over time. (Tr. 617A). Although the magistrate judge did not find the flaws in the ALJ's analysis to be grounds for reversal, U.S. District Judge Michael R. Barrett disagreed. In addition to the flaws noted by the magistrate judge, the Court pointed out:

> Dr. Hill, whose opinion the ALJ gave the most weight, was a one-time examiner, and Dr. Wunder is a specialist in rehabilitative medicine. While all of these factors are properly considered under section 1527(d)(2), the ALJ did not include a *discussion* of these factors in her decision. As such, the Court finds that the ALJ failed to articulate "good reasons" for not giving weight to the opinions of Drs. Wunder and Wilson. Furthermore, the Court finds that this failure was not de minimus. …Both doctor's opinions are based upon their treatment of Plaintiff, and as the Magistrate Judge noted, their opinions are "not necessarily inconsistent" with the record as a whole. While their opinions may not be entitled to controlling weight, their opinions should be weighted under the factors listed in section 1527(d)(2).

(Tr. 623, emphasis added).

Plaintiff now claims that the Court made a factual conclusion in his favor that his physical condition was "worsening" over time. *See* R&R at 39-40. But that is not what the Court found. Judge Hogan (who recommended *affirming* the non-disability finding) merely reasoned that a "logical" hypothesis for the more extreme opinions of Drs. Murphy and Wunder was that Plaintiff's condition had worsened over time. Neither the magistrate judge nor the district judge made any factual finding as to whether Plaintiff's condition had actually and/or significantly deteriorated.

Rather, the Court held that remand was required because the ALJ did not "fully" explain why Dr. Hill's opinion was entitled to more weight than the later opinions of Drs. Murphy and Wunder. (*Id.*). The ALJ also failed to explain on the record whether she had considered factors such as the length of the treatment relationship, the nature and

extent of that relationship, and the specialization of the physicians in question.  *See, e.g.*, 20 C.F.R. §404.1527(c)(2)(listing relevant factors). On the other hand, the Court adopted the magistrate judge's recommendation in rejecting Plaintiff's claim that he met or equaled Listing 1.04(A).  (Tr. 624).  Although the Court did not agree with the magistrate judge that the claim had been waived, the Court had no difficulty in rejecting the sole evidence - Dr. Wunder's opinion - that Plaintiff met the Listing, as "inconsistent with other substantial evidence in the record."  (Tr. 625).

### b.  Medical Evidence Leading to Second ALJ Decision

To provide context to the ALJ's more recent analysis of the opinions of Drs. Murphy and Wunder, it is necessary to summarize Plaintiff's overall medical records.  In January 2003, Plaintiff first complained to an orthopedist, Dr. Shockley, that his lingering back and neck pain from a November 2002 car accident prevented him from continuing to work as an electrician. (Tr. 127, 143).  Dr. Shockley recommended aggressive physical therapy and a variety of non-surgical interventions.  (Tr. 143).  In April 2003, Dr. Shockley authorized Plaintiff's return to "light duty" work, but since it was not "available" at Plaintiff's place of employment, he authorized Plaintiff remaining off work until May 5, 2007. (Tr. 221).  In August 2003, Plaintiff reported to Dr. Stambough, his treating neurosurgeon, that he "actually got a lot better until he 'went back to work at light duty.'" (Tr. 163).  The same month, Plaintiff underwent MRI, CT, and myelogram studies that showed only mild degenerative changes with overall spinal stability, with "minimal instability between the recumbent and upright positions."  (Tr. 167, 213-214).

From 2003 to 2004, Dr. Stambough noted multiple "normal" or near normal objective test results, including EMG, MRI, and CT mylogram, and normal neurological findings on clinical examination. In September 2003, Dr. Stambough reported no contraindications to Plaintiff's intended return to work.  (Tr. 173).  After being unable to

determine any neurological origin for Plaintiff's complaints, Dr. Stambough indicated in October 2003 that John Ruch, a chiropractor, should take over Plaintiff's care. (Tr. 179-180).  From October to December 2003, despite complaints of some soreness, Plaintiff reported to Dr. Ruch and/or Dr. Stambough that water therapy and chiropractic care had improved his functioning so much that he felt able to return to work by November 2003. (Tr. 289, 292, see also generally reported improvement at Tr. 179, 274-285, 287).

Plaintiff apparently aggravated his back in December 2003.  Shortly thereafter, in early March 2004, Plaintiff chose to have Dr. Stambough perform elective spinal fusion surgery to correct spondylolisthesis and instability.  Three weeks post-surgery, Dr. Stambough believed that Plaintiff should continue to improve, but recommended that he not be returned to work above a "medium or moderate" level due to the limited range of motion associated with a spinal fusion.  (Tr. 185-186).

Plaintiff first applied for disability benefits a month after his surgery, in April 2004. In May 2004, a state agency consultant, Dr. Hinzman, opined that Plaintiff could perform light work based on excellent post-surgical results documented by x-ray, improved reported symptoms, and normal neurological test results.  (Tr. 343-347).  In June 2004, Dr. Stambough allowed Plaintiff to try working full-time, subject to restrictions on repetitive lifting, bending, or twisting, maximum lifting of 30 pounds with frequent lifting limited to 20 pounds, and a sit/stand option "as needed."  (Tr. 192).  In October 2004, another state consultant, Dr. Hill, conducted a records review and affirmed the opinions expressed by Plaintiff's neurosurgeon, that Plaintiff was capable of at least light work, so long as he had the option to "periodically alternate sitting and standing" on an "as needed" basis.  (Tr. 355).

In 2005 when Plaintiff returned to him for re-evaluation at the chiropractor's suggestion, Dr. Stambough further referred Plaintiff to Dr. Wunder, a rehabilitative

specialist.  Dr. Wunder initially saw Plaintiff just three times in 2005: May 5, June 16, and  December 27, 2005.  (Tr. 866A, 868-874).   At his first visit in May 2005, Plaintiff reported that his surgery definitely had improved his "moderate" low back pain, but that he was experiencing shoulder impingement and was felt a need to sit "if he walks for a long period of time" or to walk after extended sitting.  (Tr. 873).  At that time, Dr. Wunder concluded that notwithstanding Plaintiff's "neuropathic type" pain, additional treatment and work hardening might yet enable Plaintiff to work in some occupation, despite an inability to return to heavy manual labor.  (Tr. 874).  At the third visit in December 2005, Plaintiff reported that he had been "doing well" on a medication that he would no longer have access to due to a lapse in insurance.  (Tr. 870).  In November of 2006, nearly a year after his last examination of Plaintiff, Dr. Wunder reviewed his 2005 notes and rendered an opinion that Plaintiff was disabled from work.  (Tr. 380-381).

Dr. Murphy, Plaintiff's primary care physician from March through December 2006, agreed that Plaintiff was "truly disabled." (Tr. 446-449).  Dr. Murphy based her opinion on Plaintiff's pain, a general decline in his health, and her belief that Plaintiff's condition had worsened over time.  (Tr. 448-449).  Dr. Murphy indicated that Plaintiff had suffered another back fracture at the point of his fusion site, that he required a cane, and that his range of motion was extremely limited.  (Tr. 448).  Dr. Murphy repeatedly mentioned Plaintiff's financial inability to afford treatment.  (Tr. 448).

After the ALJ's first adverse decision, Plaintiff sought additional treatment.  In April 2008, Plaintiff underwent an additional MRI study.  (Tr. 813-814).  In May 2008, Dr. Romanowski, another orthopedist, reported that Plaintiff's MRI showed a stable fusion mass, disk degeneration, and no obvious nerve root impingement.  (Tr. 726).  Dr. Romanowski's clinical examination also reflects essentially normal findings.  (Tr. 726).

In June 2010, after the expiration of Plaintiff's insured status, Dr. Le examined Plaintiff at the request of the Ohio Bureau of Disability Determination, and reported that Plaintiff needed a cane "for walking." (Tr. 702, 708). In December 2010, Plaintiff sought treatment from Dr. Brenneman, who noted that Plaintiff does not use a cane or other ambulation device, and upon examination was able to walk on heels and toes. (Tr. 906-907).

After this Court's remand, the ALJ engaged a medical expert. Plaintiff improperly describes that orthopedist as "a physician employed and paid by the government to defends against Mr. Steagall's disability claim" who conducted "a cursory file review." To the contrary, a medical expert is not an advocate who "defends against" a disability claim but a "neutral advisor" engaged to provide expertise in cases involving complex medical records such as this one. *See Richardson v. Perales*, 402 U.S. 389, 408 (1971). Dr. Hutson testified at the February 2011 hearing that he conducted a review of the entirety of Plaintiff's records, and the thoroughness of his review is evident from the undersigned's review of his testimony. Among the records reviewed by Dr. Hutson were the records of Dr. Wunder. In addition to the three consultations with Dr. Wunder in 2005, Plaintiff returned to see Dr. Wunder two or three more times: on September 1, 2008, on April 27, 2009, and on December 2, 2010.[2] (Tr. 867, Tr. 684-690, 895-897).

### c. Whether the 2011 Explanation Constitutes "Good Reasons"

In light of this Court's directive on remand, the ALJ attempted to more "clearly explain why the opinions of Dr. Wunder and Dr. Murphy are not entitled to controlling

---

[2]At the December 2, 2010 visit, Dr. Wunder noted that, notwithstanding Plaintiff's insistence that he had seen Dr. Wunder in July 2010, Dr. Wunder's search of his own records reflected hat he last saw Plaintiff in September 2008, although he acknowledges having sent records "for Social Security Disability" for Plaintiff between September 2008 and December 2010. (Tr. 894-895). Thus, despite Dr. Wunder's April 27, 2009 narrative suggesting an examination that date, Dr. Wunder's December 2010 records reflect some ambiguity as to whether he examined Plaintiff at that time or merely reviewed and dictated the 2009 letter for purposes of Plaintiff's social security claim.

weight." (Tr. 603). Because Plaintiff argues that the ALJ's analysis is "not supported by the record or this Court's prior findings" (Doc. 7 at 11), the undersigned finds it appropriate to quote extensively from the ALJ's 2011 detailed analysis.

> The ALJ began with Dr. Murphy's opinion that Plaintiff was "truly disabled."
>
> Dr. Murphy is a primary care physician …who treated the claimant for not even a consecutive 12 month period.  Disability is defined as the inability to engage in substantial gainful activity for a continuous 12 month period.  Dr. Murphy's treatment notes report symptoms, medications, and very little evidence or discussion about positive findings on examination, objective testing, or other medical bases for her opinions.  It actually appears Dr. Murphy only saw the claimant for about 8 visits over a 10 month period.  As noted in the prior decision, she cites only to pain and limitation of motion as the basis for her opinion that the claimant was "disabled."  While she mentions a rotator cuff tear, this appears based entirely on the claimant's report (…for example, where the claimant reports a partial rotator cuff tear that cannot be fixed due to lack of insurance).  Further, whether the claimant is disabled is a finding reserved for the Commissioner….and there is no indication that Dr. Murphy understands what the definition of disability is under the Social Security Act.
>
> The undersigned has considered her statement that the claimant cannot sit or stand for an extended period and has incorporated that limitation into the residual functional capacity to the extent it is supported by the overall evidence.  However, the undersigned rejects Dr. Murphy's opinion that the claimant is disabled.  She appears to give great consideration to the claimant's financial status and the fact that he is compliant with treatment, but the undersigned has not found the claimant noncompliant, and his financial status has no bearing on whether he is disabled. … Dr. Murphy also gives a great deal of weight to her 'observation' of the claimant, but her treatment notes do not document any observations that are consistent with disability.

(Tr. 603-604).

Plaintiff now argues that the ALJ erred by suggesting that Dr. Murphy was required to cite specific objective tests for her opinions. Plaintiff argues that "[a] summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial." *See Jones v. Com'r of Soc. Sec.*, Case No. 1:05-cv-789, 2005 WL 3742187 at *9 (S.D. Ohio, Dec. 15, 2006).  However, *Jones* also states that the "weight

given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record." *Id.*  Although Plaintiff argues that the ALJ should have given Dr. Murphy's RFC and disability opinions controlling weight because they were consistent with the opinions of Dr. Wunder, the undersigned disagrees.  Unlike in 2007, the ALJ's 2011 analysis is sufficiently detailed and fully supported by the record.  Dr. Murphy's letter admits that she has never performed "a full functional evaluation" to assess Plaintiff's ability to work. (Tr. 682).  Therefore, the ALJ's reasoned explanation for rejecting Dr. Murphy's assessment satisfies the "good reasons" standard and sufficiently explains why she was not required to give the opinion "controlling weight."

The ALJ's 2011 analysis of Dr. Wunder's opinions is even more detailed. Pointing out Plaintiff's sporadic history with Dr. Wunder, the ALJ first remarked that "Dr. Wunder is…not necessarily a 'treating source' who has consistently seen and treated the claimant over an extended period of time." (*Id.*).[3]  The ALJ's comment is consistent with her obligation to consider the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship.

The ALJ next described Dr. Wunder's November 2006 opinions as follows:

> Dr. Wunder's November 2006 summary….indicated a "right shoulder rotator cuff tear" and left shoulder pain – even though imaging had previously shown no tear and Dr. Stambough had clearly stated that the claimant's left shoulder pain had 'resolved completely…has resulted in no impairment, no pain, and no dysfunction' (13F/1).  Reading Dr. Wunder's report, it is difficult at times to tell whether he was reporting his own findings or interpreting other doctors' findings.  Nonetheless, Dr. Wunder mentioned chronic decreased strength over the left EHL, diminished sensation, diminished left Achilles reflex, and "irritable straight leg raise."

---

[3]Magistrate Judge Hogan likewise characterized Dr. Wunder's "treating physician" status as "problematic," when describing his three 2005 consultations. (Tr. 617A).  In December 2010, Dr. Wunder stated that Plaintiff wanted him to "take over his care" but also remarked that he had not seen Plaintiff in more than two years. (Tr. 895).

He also stated, "he had a lumbar fusion, left leg radiculitis, and left shoulder impingement with rotator cuff syndrome."

Dr. Wunder said he thought the claimant had some type of neuropathic pain syndrome, and he advised conditioning and work hardening. He also said the claimant "met the listings for Social Security at the time of my initial evaluation on May 6, 2005" (14F/2). He further stated, my diagnosis would be that of status post lumbar fusion at L4-5 and intermittent radiculitis in the leg. I thought he met the listings for chronic radiculopathy. He had clinical findings with sensory loss, motor loss, and reflex loss that met that diagnosis. He also had underlying shoulder impingement. I thought his prognosis was poor. I did not think he could sustain remunerative employment. I thought he had permanent loss of residual functional capacities. His impairment rating would be 27% to the whole person form [sic] the auto accident and fusion" (14F/3).

(Tr. 602-603, quoting Tr. 380-381).

After summarizing Dr. Wunder's 2006 opinions, the ALJ launches into a very

detailed analysis, beginning with the 2006 opinion, re-iterated in 2010, that Plaintiff

meets or equals Listing 1.04:

Dr. Wunder opined that the claimant met listing 1.04 and could not do any work. Dr. Wunder's opinion and clinical findings have been widely divergent from other doctors' opinions and findings and from the diagnostic evidence, as discussed above. There is no reason to believe the claimant's condition had worsened appreciably between April 2004, when he last saw Dr. Stambough, and May 2005, when he first saw Dr. Wunder. Dr. Wunder performed no new diagnostic tests but instead relied largely on the claimant's allegations of subjective pain in reaching his conclusions.

As the Court noted, Dr. Wunder's opinion that the claimant 'met the listings for chronic radiculopathy' was contradicted by CT testing and was also inconsistent with other substantial evidence of record. . .. The medical expert, Dr. Hutson, who is an orthopedic surgeon whose opinion is entitled to more weight than Dr. Wunder's by virtue of his expertise, noted that Dr. Wunder's neurologic findings were inconsistent from one examination to another. Dr. Hutson also testified that many of Dr. Wunder's neurologic findings could not be explained orthopedically. Dr. Hutson testified that in November 2006, Dr. Wunder mentioned findings that are not even consistent with the neuro-anatomical distribution of any particular nerve root. Instead, he noted findings that are partially associated with L5 and findings that are partially associated with the S1 nerve root. Dr. Hutson further testified that in September 2008, Dr. Wunder said the claimant's reflexes were equal and that his motor and sensory examination was intact (23F), so Dr. Wunder's findings even vary within his own

examinations.   Dr. Hutson also pointed out that in 2009, Dr. Wunder mentioned yet another, different, set of findings associated with L3-4 nerve root distribution.  Dr. Hutson said straight leg raising is a test for sciatic nerve irritation that goes all the way to the bottom of the foot. Therefore, Dr. Wunder's finding that the claimant had pain to the knee is not indicative of a positive straight leg raise.  Dr. Wunder asserts the nature of the claimant's back impairment is "misunderstood" because it is a stretching or tethering of nerves rather than compression, but it is unlikely so many specialists would misunderstand the objective evidence. Dr. Hutson testified that there was no evidence of tethering associated with pain or dysfunction at all.  Thus, Dr. Hutson questioned many of Dr. Wunder's findings, said they were inconsistent from one exam to another and very inconsistent with findings set forth in the remainder of the records.  He said the claimant's condition did not meet or equal a Listings [sic] and noted normal neurologic findings based on other exams in the record as noted above.

Even without Dr. Hutson's testimony, the record sufficiently establishes that Dr. Wunder's findings are inconsistent with other doctor's findings. Although Dr. Wunder made and found positive neurologic findings throughout his reports, the undersigned has pointed out at least 11 other examinations where neurological findings were completely normal from December 2002 through December 2010.  In fact, Dr. Murphy's notes consistently documented no motor, sensory, or other neurological deficits…while Dr. Wunder was simultaneously reporting neurological deficits.  A March 2006 ER examination showed 5/5 muscle strength bilaterally in both the upper and lower extremities; normal sensory examination bilaterally; normal gait, normal tandem gait, and "completely normal and nonfocal neurological exam" (22F/59).  A May 2007 ER examination also showed the claimant could walk on his heels and toes. His range of motion was decreased, but his muscle strength was 5/5 bilaterally.   Deep tendon reflexes were symmetrical.   Sensation was grossly intact.   EHL strength was normal and equal (contrary to Dr. Wunder's finding of EHL weakness), and gait was normal (22F/47).  An August 2007 ER examination showed full range of motion of the back, including flexion, extension, lateral rotation, and bending (22F/20).   In November 2007, Dr. Murphy even noted the claimant had 5/5 strength (22F/11).  In May 2008, orthopedist James Romanowski, M.D. reported the claimant had limited range of back motion but 5/5 strength throughout his lower extremities, negative straight leg raise, and intact sensation throughout his lower extremities (22F/14).   Dr. Stambough, a neurosurgeon, also reported numerous normal neurological findings…. Still, Dr. Wunder always found positive neurological findings when he examined the claimant.  Unlike Dr. Wunder's, Dr. Stambough's treatment notes are consistent, and at no time does he render an opinion or give advice inconsistent with his treatment notes and clinical findings.  Even the medical expert had a difficult time reconciling Dr. Wunder's findings with the objective testing such as MRIs, CT scans, x-rays, and EMG testing.

Dr. Wunder who was contacted by counsel and in 19F he writes a long letter to counsel about the claimant's condition and to comment on findings in the undersigned's prior decision. He again opines the claimant's impairment meets listing 1.04 and, in the alternative, provides a residual functional capacity assessment. As previously noted, Dr. Wunder's opinion that the claimant's degenerative disc disease meets listing 1.04 is completely unsupported – a fact that did not escape even the Court. That he consistently argues to the contrary significantly undermines Dr. Wunder's reliability and his opinion as a whole. Also undermining Dr. Wunder's opinion is his mischaracterization of other doctors' findings. He said, for example, that Dr. Shockley noted "stretching or tethering of the nerve root" (!9F/2). Dr. Shockley made no such finding. He noted that Dr. Stambough performed surgery because he "had to" reduce the instability, when in fact, Dr. Stambough noted only very minimal instability and said surgery was not mandatory but completely elective. Dr. Wunder also tends to gloss over details like the long gap in treatment, indicating, "I started to see the patient in 2005."

(Tr. 604-605).

As if that level of detailed analysis were not sufficient, the ALJ went on:

Dr. Wunder also reports the claimant has "obligatory" use of a cane, and the claimant testified at the prior hearing that his cane use began around February 2007. Yet most of the medical records either do not mention a cane or specifically say a cane is not used even after February 2007. Exhibit 21F mentions the claimant using a cane, but there is no mention of a cane in the following exhibits, with dates ranging from 2007 through 2009: 20F, 22F/6-7, 22F/14, 22F/20, 22F/30-33, 22F/44-45. In fact, most of these examinations show full strength and no difficulty with ambulation. "No" use of cane is also reported at 25F/8 in December 2010, yet Dr. Wunder indicated he use of a cane is mandatory. Consultative examiner Chuc Le, M.D., reported in June 2010 that the claimant used a cane for support, but his examination also showed only moderate tenderness to palpation, no swelling of the back, no guarding or spasm, intact sensory examination in the lower extremities, ability to walk with an antalgic gait, ability to walk on his toes and heels, ability to squat, no atrophy, and symmetrical reflexes (21F/2). It is also worth mentioning that while Dr. Wunder described diminished and/or absent patellar and Achilles reflexes, Dr. Le specifically noted equal Achilles and patellar reflexes bilaterally (21F/2). Regarding the claimant's shoulder, Dr. Le found only moderate tenderness to palpation.

Dr. Wunder also opined the claimant has carpal tunnel syndrome…and limits hand use in reaching, handling, fingering, fine grip, and manipulation. When counsel was asked to walk the undersigned through the record to show common findings establishing carpal tunnel syndrome, he could not. As such, there is no EMG evidence…which is the most

common testing to diagnose this problem.  There are no reports of ongoing positive Phalen's or Tinel's testing, splinting, injections, or hand surgery over a 12 month period to establish a "severe" or "limiting" carpal tunnel syndrome.  In fact, neurosurgeon Dr. Stambough specifically and repeatedly noted the absence of a positive Tinel's sign. … Dr. Wunder reported "nocturnal parathesias of both hands" yet also acknowledged the claimant never had any diagnostic testing for carpal tunnel syndrome.  He apparently found that the claimant's subjective complaints alone are enough to make a diagnosis that would significantly limit his manual dexterity.  However, subjective statements…will not alone establish that the individual is disabled; there must be medical signs and laboratory findings which show that the individual has a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged. …  Dr. Wunder limited hand use even though other examinations, like the consultative examiner's Dr. Le, found no hand limitations (in June 2010 – 21F/2), and other doctors did not even mention carpal tunnel syndrome.  This is yet another example of Dr. Wunder's findings and conclusions being inconsistent with the remainder of the record and another reason that Dr. Wunder's opinion appears unreliable in this case.

The medical expert agreed…finding Dr. Wunder's report lacking and inconsistent with the remainder of the record….The undersigned gives little weight to Dr. Wunder's opinion that the claimant's impairment meets listing 1.04 or to his conclusion that the claimant is disabled and unable to engage in sustained remunerative employment.  The undersigned finds Dr. Wunder's opinions and findings generally unreliable and it appears he is being an advocate on behalf of the claimant's disability.

(Tr. 606).

Plaintiff continues to advocate for a different interpretation of Dr. Wunder's opinions.  He submits that the ALJ continued to err in her assessment of those opinions in several distinct ways.  First, Plaintiff suggests that the ALJ should not have found Dr. Wunder's opinions to be inconsistent with other evidence of record, given this Court's prior determination that those (later) opinions were not necessarily inconsistent with Plaintiff's earlier records.  However, as discussed above, Plaintiff misconstrues the Court's basis for remand, which was the ALJ's failure to satisfy the "good reasons" standard.  That this was a relatively close case even in 2009 is suggested by the fact that Magistrate Judge Hogan recommended affirming the non-disability finding, despite his expressed failure to "understand" the ALJ's conclusory reasoning.  Nothing in the

Court's order of remand prohibited the ALJ from reaching the same conclusion or from rejecting for a second time the opinions of Drs. Murphy and Wunder. In stark contrast to 2007, the ALJ's 2011 analysis is anything but conclusory. In fact, the ALJ engaged an orthopedic medical expert, Dr. Hutson, to review Dr. Wunder's opinions as well as the entirety of Plaintiff's medical record.

Second, Plaintiff asserts that the ALJ incorrectly describes Dr. Wunder's opinions as "widely divergent" from other opinions. For example, Plaintiff claims that Dr. Hutson, "agreed with many of Dr. Wunder's findings," including instability at L3-4, and a diagnosis of degenerative spondylotisthesis and chronic L5 radiculopathy. (Doc. 7 at 12). Plaintiff correctly asserts that, after initially testifying that Dr. Wunder found "negative" carpal tunnel test results, Dr. Hutson conceded at the hearing that Dr. Wunder found that Plaintiff "did have a positive Tinel and Phalen's and carpal compression test" on examination. (Tr. 952, quoting Tr. 687). Last, Plaintiff contends that the ALJ "ignored" Dr. Le's statement – consistent with Dr. Wunder's opinion - that Plaintiff "needs" to use a cane. (Tr. 702, 708).

With respect to the last statement, the ALJ specifically discussed Dr. Le's report that Plaintiff required a cane, and why he rejected that particular assessment. The ALJ also explained why she discredited Dr. Wunder's report of positive carpal tunnel test results. Despite her partial misstatement concerning Dr. Hutson's testimony on the issue (which was contradictory), the ALJ provided other valid reasons for discounting Dr. Wunder's carpal tunnel diagnosis as evidence of a "severe" impairment lasting 12 or more months. As the Defendant points out, in December 2010, Dr. Brenneman again found that Plaintiff does not use a cane. (Tr. 905-906). And in September 2008, even Dr. Wunder stated that Plaintiff does not use or require a cane and that he "ambulates without any assistive devices." (Tr. 867). Despite some minimal agreement, Dr. Hutson

extensively testified to his disagreement with Dr. Wunder's opinions. (*See, e.g.,* Tr. 955, disagreeing with Dr. Wunder that Plaintiff's condition worsened). Importantly, Plaintiff's treating neurosurgeon, Dr. Stambough, repeatedly documented normal neurological findings and opined that Plaintiff could return to light work. In short, the undersigned does not find the handful of instances in which Dr. Wunder's opinions could be described as "consistent" with other medical evidence to overcome the far more significant inconsistencies in Dr. Wunder's opinions that were discussed *ad nauseam* by both Dr. Hutson and the ALJ on remand.

Third, Plaintiff returns to Dr. Wunder's opinion that, based upon his initial assessment of Plaintiff in May of 2005, Plaintiff met Listing 1.04 and continued to meet that listing through 2010. Plaintiff points to his last MRI dated April 2008 (after the first hearing) that "suggested a small disc herniation with right L5 nerve root impingement biforaminal disc protrusion and annular tears at L3-4 . .." (Tr. 603). Plaintiff argues that Dr. Wunder personally reviewed the April 2008 MRI study in September 2008, and opined that it reflected "some protruding disks and annular tear at L3-L4 that likely is the source of his complaints." (Tr. 867). In April 2009, Dr. Wunder further opined that Plaintiff had radiculopathy, based in part on the same MRI. (Tr. 690). However, Dr. Hutson provided extensive and credible testimony as an orthopedic expert as to why Plaintiff does not meet or equal Listing 1.04 (Tr. 945-948), and the ALJ clearly was entitled to rely upon that testimony, as well as upon the objective and clinical medical evidence in the record that contradicted Dr. Wunder's assessment.

The ALJ also properly discounted the April 2008 MRI as inconclusive, noting that Dr. Romanowski "reported in May 2008 that there was no obvious nerve root impingement on this MRI study." Even the radiologist who read the 2008 MRI described the study as "significantly limited." (Tr. 814). Plaintiff faults the ALJ for failing to discuss

a single examination record dated February 2009 by Dr. Ankur Shah, in which the latter physician, with reference to the same MRI, noted "*a question* of minimal biforaminal disk protrusion or L3 to L4 with associated annular tears….and …some impingement on the right L5 nerve root."  (Tr. 719, emphasis added).  However, the Sixth Circuit has never required an ALJ to discuss every medical record.  *See Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  More importantly, Dr. Shah's reference to the MRI is not conclusive, and his clinical neurological exam revealed a normal gait, decreased spinal range of motion, but full extremity muscle strength, full sensation, intact cranial nerves, and negative straight leg raise.  Dr. Shah recommended that Plaintiff lose weight, do aquatherapy, and walk more.  (Tr. 719).  Thus, Dr. Shah's clinical findings were consistent with the ALJ's conclusion that "contemporary examination [to the MRI] showed no evidence of nerve root impingement…."  (Tr. 603).  Dr. Romanowski's clinical exams also were consistent with the ALJ's conclusion, revealing a negative straight leg test, full muscle strength in the extremities, and full sensation.  (Tr. 726).  A follow-up record from University Hospital three months after Dr. Shah's exam similarly consistently recommends "very conservative treatment…given that he has responded [before] to the antitriptyline and his other medications," a plan with which Plaintiff was "very comfortable."  (Tr. 725).

Last, Plaintiff cites *Meece v. Barnhart*, 192 Fed. Appx. 456, 462 (6th Cir. 2006), wherein the Sixth Circuit was critical of the ALJ's failure to give Dr. Wunder's opinions "controlling weight" as a treating source.  However, *Meece* is distinguishable because the ALJ clearly provided "good reasons" for the "little weight" she gave Dr. Wunder's opinions in this case.  The fact that Dr. Wunder's opinions were accepted in another

case does not mean that they are entitled to controlling weight here.[4]

### 2. Consulting Physicians Drs. Hill and Hutson, and Plaintiff's RFC

In *Blakley*, the Sixth Circuit reiterated the principle that "[i]n appropriate circumstances, opinions from State agency medical...consultants...may be entitled to greater weight than the opinions of treating or examining sources." *Id.*, 581 F.3d at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). The *Blakley* court reversed because the state non-examining sources did not have the opportunity to review "much of the over 300 pages of medical treatment...by Blakley's treating sources," and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consulting physician's opinions. *Id.*, 581 F.3d at 409 (quoting *Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007)). Under *Blakley*, then, an ALJ may choose to credit the opinion of even a non-examining consultant such as Dr. Hill, who has not had access to a complete record, but the ALJ should articulate her reasons for doing so. If the ALJ fails to provide sufficient reasons, the opinion still may be affirmed if substantial evidence supports the opinion and any error is deemed to be harmless or *de minimis*.

Consistent with *Blakley*, this Court previously held that ALJ Smith failed to adequately explain her reasons for giving consulting Dr. Hill's opinions more weight than the opinions of two treating physicians who rendered later opinions. Dr. Hill did not have access to the later records of Drs. Murphy and Wunder, but in 2011, the ALJ had not only Dr. Hill's opinoin, but additional medical records, and testimony from a consulting

---

[4]*Meese* is also factually distinguishable. Dr. Wunder had a much more extensive treating relationship with the plaintiff in that case, having been a primary treating physician for plaintiff's neck pain, and having prescribed various forms of physical therapy, cervical traction, the use of a TENS unit, and a prescription medicine regimen. By contrast, Plaintiff visited Dr. Wunder on but a few occasions for consultation.

orthopedic medical expert.   Dr. Hutson reviewed the entirety of Plaintiff's medical records through 2010.

In her 2011 opinion, the ALJ explained why she was continuing to rely on Dr. Hill's 2004 opinion as still relevant, due to a lack of evidence of "worsening of [Plaintiff's] condition after the 2004 opinion was rendered." (Tr. 607-608).  Plaintiff protests that even Dr. Hutson testified that Plaintiff was experiencing a "continuing degeneration in his spine." (Tr. 948). However, Dr. Hutson clearly disagreed with Dr. Wunder's conclusion that Plaintiff's records showed his condition had worsened to the point of disability prior to December 2009.  (Tr. 955).

### 3.   Hypothetical RFC

#### a.   The Sit/Stand Option

Vocational expert testimony that is given in response to a hypothetical question that accurately describes the plaintiff in all "significant, relevant respects" will constitute substantial evidence on which the Commissioner's decision may be affirmed.  *See Felisky v. Bowen*, 35 F.3d 1027, 1035-36 (6th Cir.1994).  In this case, the same VE, Dr. George Parsons, testified both in 2007 and in 2011.  (Tr. 966).  Dr. Parsons opined that, based upon the hypothetical proposed by the ALJ and Plaintiff's transferable skill set, Plaintiff would have remained capable of performing multiple skilled and semi-skilled jobs at the light and sedentary levels.  (Tr. 970, 973-974, 979-980).

In arguing that the VE's testimony does not satisfy the substantial evidence standard in this case, Plaintiff criticizes the ALJ for failing to explain the inconsistencies between other opinions and Dr. Hutson's testimony that Plaintiff "could sit 6 hours per day, with a sit/stand option permitting him to stand up for 2-5 minutes every hour" which minutes "would not have to be consecutive." (Tr. 608, 949).  In contrast to Dr. Hutson's testimony, Drs. Stambough and Hill both opined that Plaintiff should be able to sit and

stand "at will." Thus, Plaintiff argues that the manner in which the ALJ incorporated the sit/stand opinion into the hypothetical presented to the VE is "inconsistent" with the opinions of Drs. Stambough, Murphy, Wunder, and Hill.  On that basis alone, Plaintiff argues for an outright reversal for an award of benefits.  (Tr. 968).

The undersigned disagrees.  It is both the prerogative and the duty of an ALJ to determine which among conflicting physician opinions should be credited.  *See Cox v. Com'r of Soc. Sec.*, 295 Fed. Appx. 27, 35 (6th Cir. 2008).  Here, the ALJ reasonably credited Dr. Hutson's opinion concerning the sit/stand opinion, given that Dr. Hutson evaluated the entirety of Plaintiff's records and all of the varying sit/stand opinions (including Dr. Hinzman's 2005 opinion that no sit/stand option was needed).  In addition, the vocational expert affirmed testimony from the 2007 hearing that Plaintiff could work assuming Dr. Hill's residual functional assessment, which included the "at will" sit/stand option.  (Tr. 966-71).  To that extent, the undersigned finds that any error in the phrasing of the sit/stand option was harmless.[5]

### b. Unskilled Versus Skilled Work and the Sit/Stand Option

Plaintiff notes that Dr. Hutson initially testified that he "was going to put him at the sedentary level" (Tr. 948), and testified in favor of the ALJ's determination that Plaintiff could lift up to 20 pounds only after further questioning by the ALJ.  (Tr. 948-949).  Dr. Hutson testified that Plaintiff was capable of "some of the light jobs, but mostly sedentary…with a sit/stand option." (Tr. 958).  Plaintiff relies upon the vocational expert's testimony that Plaintiff wouldn't be able to perform light work "based upon the RFC provided by Dr. Hutson," but would instead be limited to sedentary work.  (Tr. 969).

---

[5]Plaintiff would have been prohibited from work only if the ALJ had accepted Dr. Wunder's opinion that Plaintiff had to *continually* alternate between sitting and walking *every 10 minutes.* (Tr. 971).

To the extent that Plaintiff is suggesting that remand is required based upon the ALJ's determination that he was capable of engaging in a limited range of "light" work during the relevant disability period, I disagree. More important than Plaintiff's concession that there was some evidence to support the designation of "light" work is the fact that the VE testified, and the ALJ found that Plaintiff had transferable skills that he could use to perform a significant number of jobs at the sedentary level.

Plaintiff's primary argument appears to be that a sit/stand option precludes him from sedentary work under *Wages v. Sec'y of Health & Human Servs.*, 755 F.2d 495, 498 (6th Cir. 1985). However, the Court in *Wages* was focused on unskilled work. In concluding that a sit/stand option is generally incompatible with *unskilled* sedentary work, the Sixth Circuit quoted from Social Security Ruling 83-12, including the section that distinguishes skilled work:

> There are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [vocational expert] should be consulted to clarify the implications for the occupational base.

*Wages v. Sec'y of Health & Human Servs.*, 755 F.2d at 498. In this case, Dr. Parsons clearly testified that Plaintiff possessed transferable skills that could be employed in several jobs that, while sedentary, would in fact permit a sit/stand option.[6]

---

[6]Although this is not technically a "Grid" case, Rule 201.07 also would mandate a non-disability finding for a high school graduate of advanced age, limited to sedentary work, who possesses skilled or semi-skilled transferable skills.

### 4.  Credibility Assessment

In the prior remand order, this Court instructed the ALJ to reassess Plaintiff's credibility, insofar as her prior credibility determination "appears to be based solely upon Dr. Hill's opinion." (Tr. 621). The Court explained that the credibility assessment was not necessarily erroneous, but that "[w]hether Dr. Hill's opinion can serve as substantial evidence is dependent upon whether her opinion deserved greater weight tha[n] Drs. Wunder and Murphy."  (Tr. 621).

A disability claim can be supported by subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Com'r of Soc. Sec.*, 336 F.3d at 475.  However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476. (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Further, a credibility determination cannot be disturbed "absent a compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, his testimony, and other evidence.  *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Plaintiff now argues that the ALJ again erred in finding him not to be fully credible.  The ALJ acknowledged that he had a solid work record, that the nature of his complaints corresponded with the objective medical evidence, and that he was

"generally credible." (Tr. 18).  The ALJ stated that Plaintiff "clearly does feel some pain, and while the mechanism of his pain may be poorly understood, there is evidence to support his complaints – to a degree." (Tr. 608).  However, she discounted Plaintiff's allegations that his pain was disabling, reasoning that she could not "ignore the substantial evidence indicating that [Plaintiff's] pain is out of proportion to the medical findings." (Tr. 608).

Aside from the ALJ's assessment of the medical evidence, which the undersigned has already found to be supported by substantial evidence, Plaintiff complains that the only "inconsistent statements" that the ALJ pointed to were his statements to Dr. Wunder in December 2010 (a year after the date last insured) that he no longer wanted to take prescribed narcotic pain medication.  The ALJ could not reconcile those statements with the fact that Plaintiff had been "on Oxycontin, Percocet, and Methodone for years – yet he alleges disabling and incapacitating pain through the present case." (Tr. 607).  Plaintiff refers to notations in Dr. Wunder's records, however, that imply that Plaintiff wished to discontinue the medications because the Oxycontin "just knocked him out."  (Tr. 895-96).  Plaintiff argues that, as a whole, there is no conflicting evidence in the record on the issue of his severe pain, pointing to records that he contends support his testimony of constant disabling pain. (Tr. 15, 18).  He argues that even Dr. Hutson "recognized" Plaintiff's "intense pain."  (Doc. 7 at 21).  On cross-examination, Dr. Hutson agreed that Plaintiff's prognosis was poor and that he suffers from severe pain. (Tr. 958-959).  Dr. Hutson testified that it is "possible" that Plaintiff would be unable to perform a sedentary job due to his complaints of pain.  (Tr. 965).  Plaintiff argues that is significant that none of his treating physicians have ever questioned the severity of his pain.

However, Plaintiff's complaints of a disabling level of pain have not been as consistent as he suggests. It is a mischaracterization to suggest that even Dr. Hutson testified that Plaintiff suffers from disabling pain.  Dr. Hutson did not examine Plaintiff but instead based his assessment on a review of the medical record; on cross examination he acknowledged only the obvious – that *if* Plaintiff's complaints of a disabling level of pain were credited, he would be unable to work.  (*Accord* Tr. 981, testimony of Dr. Parsons that "if" Plaintiff had experienced a constant "9 out of 10" level of pain prior to December 31, 2009, he would have been unemployable).

Ultimately, it was for the ALJ to determine whether Plaintiff's pain complaints were fully credible.  And, consistent with that determination, multiple objective and clinical records fail to support Plaintiff's contention that he *consistently* complained of pain at a *disabling* level.  Particularly from 2003 through 2005, Plaintiff reported to many physicians that his treatments, including water therapy, medications, and chiropractic care, had resulted in so much improvement that he felt able to return to work.  (Tr. 173, 180 "happier and more content" with progress, Tr. 192 "symptoms..just achiness in the back," Tr. 223 "significant improvement…comfortable returning to work," Tr. 274-276, Tr. 288, "continuing" and "progressive" improvement, Tr. 289 "quite pleased…feels that he probably could return to work," Tr. 292, Tr. 350, reporting that he cooks, cleans, does laundry, grocery shops, and goes out with brother).  Even Dr. Wunder's notes reflect Plaintiff's report that his 2004 surgery had improved his "moderate" low back pain or tightness, and suggested (at least in May 2005) that Plaintiff may be able to return to some form of work with further treatment.  And Plaintiff subsequently reported doing well on prescribed medication.  (Tr. 759, 5/7/07 clinical record stating "his pain is reasonably well controlled with conservative management.")

Cases involving claims of disability based primarily on complaints of disabling levels of pain that are not fully supported by clinical records or objective medical evidence are, by their very nature, particularly difficult.  However, this Court must affirm so long as substantial evidence exists in the record as a whole to support the ALJ's decision, even if substantial evidence also can be found to support a contrary conclusion as to the credibility of a plaintiff's pain complaints.  Reviewing the record as a whole, the undersigned concludes that substantial evidence exists to affirm the ALJ's 2011 decision in all respects, including the credibility finding.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** the non-disability decision of the Commissioner be **AFFIRMED** and that this case be **CLOSED**. Plaintiff's request for oral argument should be denied.

_/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KENNETH STEAGALL,                                          Case No. 1:12-cv-876

       Plaintiff,                                          Barrett, J.
                                                           Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).